(No. 14866.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOSEPH GARBACIAK *et al.* Plaintiffs in Error.

*Opinion filed December 19, 1922—Rehearing denied Feb. 8, 1923.*

1. CRIMINAL LAW—*when an instruction requiring jury to adopt theory of innocence does not apply.* An instruction in a prosecution for robbery requiring the jury to adopt a theory of innocence rather than a theory of guilt if the jury can find a theory, supported by the testimony, consistent with the innocence of the defendants, is properly refused, where there are no two theories in the case but merely a question of the credibility of the evidence and its sufficiency to prove the charge.

2. SAME—*argumentative instruction is properly refused.* An instruction which states no proposition of law but is merely an argument on the evidence is properly refused.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. JOSEPH H. FITCH, Judge, presiding.

LEWIS A. HAUSCHILD, and HARRY YABLONKY, for plaintiffs in error.

EDWARD J. BRUNDAGE, Attorney General, ROBERT E. CROWE, State's Attorney, and EDWARD C. FITCH, (EDWARD E. WILSON, CLYDE C. FISHER, and HENRY T. CHACE, JR., of counsel,) for the People.

Mr. JUSTICE DUNN delivered the opinion of the court:

Joseph Garbaciak and John Peich were convicted in the criminal court of Cook county of robbery while armed with a revolver. Their ages were found to be, respectively, seventeen and eighteen years. They were sentenced to imprisonment in the State reformatory in accordance with the Parole law, and have brought up the record as a return to a writ of error.

Harry Nathanson, whom the indictment charged the defendants with robbing, was a diamond jewelry salesman in the employ of S. V. Slater. He testified that he called at the jewelry store of M. J. Harris, on West Chicago avenue, in Chicago, about three o'clock in the afternoon of June 7, 1921, to sell him some diamonds. He was standing in front of the counter, close to the door, talking to Harris, who was behind the counter, and was just closing his wallet when the defendants came in, each with a revolver in each hand, and said, "Stick them up!" They ordered Nathanson and Harris to the rear of the store, where they were kept by Garbaciak behind a large safe while Peich robbed the store. Garbaciak took from Nathanson a diamond ring valued at $300, a diamond scarf pin valued at $35, a watch, chain and pocket knife, and a wallet containing $95. His watch, chain and a knife were taken from Harris and other property from the store. The defendants were arrested at about 8:30 the evening of the next day by a party of police officers in an automobile on Fortieth place, who saw a Cole automobile in front of 2916 West Fortieth place, which started to move away. The police sergeant blew the horn and told the persons in the automobile that they were police officers, and this statement was met by three or four shots from the Cole automobile, to which one of the policemen replied, killing the chauffeur, whose name was Janicek or Janek. The Cole car pulled into the curb and one of the men jumped out and ran. Peich was on the front seat

with Janek lying against him, and Garbaciak was in the rear seat under some bedclothes. A 32-caliber revolver was taken from Garbaciak and Nathanson's watch and chain from Peich. They were taken to a police station, where they were examined, and about two or three o'clock in the morning police officers went with Garbaciak to 1823 Wabash avenue, where Garbaciak claimed to live. In his room nothing was found except a few clothes. Garbaciak showed the officers another room in the same building which he said was occupied by Janek and Peich. In that room he handed the officers a bank book and a check which were taken from the jewelry store at the time of the robbery, and in that room was found a suit of clothes belonging to Peich.

Both Nathanson and Harris identified the defendants at the police station after their arrest. Nathanson testified that when he identified them on the afternoon of June 9 they were standing in line with other men, and after he pointed them out he talked with them in the presence of McCarthy and McFadden, two of the police officers. He testified that he went up to Garbaciak and said, "Well, let's shake hands," and Garbaciak looked at him and said, "It is all right." Nathanson said, "I just want to shake hands; you did a good job of it but you got caught, that is all," and Garbaciak said, "Yes, we got caught." Nathanson spoke to Garbaciak about when he took Nathanson's scarf pin out, saying, "Remember, I handed you the safety catch also?" and Garbaciak laughed and said, "Yes." Peich was there and laughed but did not say anything about that.

McCarthy testified that he asked Garbaciak and Peich if they knew Nathanson, and they laughed and said they did. Nathanson talked awhile with them and joked about the way they held him up, and Garbaciak had reached over for his pin and he took the pin out himself and said, "I will take it out," and gave him the stick pin. Garbaciak joked and laughed about it and did not say any more. McFadden testified to the same conversation.

Garbaciak testified that Janek, Peich and he were friends, having been schoolmates, and that the way he happened to go in the automobile the night of the arrest was that he met Janek, who came over with the car and picked him up, and they went over to Peich's house and picked him up. They were riding around for awhile and then picked up Mike Tomashefsky, and they went over and helped him move. The first time they stopped was down there when the detectives came over and shot at them. He testified that no furniture was being moved,—only bed clothing and feathers. He denied that a revolver was taken from him.

Peich testified as to the arrest that Janek asked him to take a ride and he got in the machine. They drove over to Fiftieth and Paulina streets, where they met Tommy or Tony,—he didn't know the man,—and helped him move some of his wife's things. They backed up in the alley and took out a bunch of sheets and bedding, mattresses and pillows, and some of her clothing, and put it in the machine, and from there they went to Fortieth place, and the machine was standing in front of Fortieth and Francisco, and all he knew was the next he heard was shots. He did not know where they came from and ducked under the seat. In regard to the watch and chain which were found on him at the time of the arrest, he testified that he bought them of Janek and paid $10 for the watch and $3 for the chain and knife.

Garbaciak testified that he only used the room which he had at the rooming house a part of the time but spent four or five nights of the week at the home of his father and mother, and Peich testified that the room where his clothes were found was Janek's and he only occasionally spent a night with Janek. Both of the defendants denied the conversation to which Nathanson and the police officers testified as taking place when Nathanson testified he identified them at the police station.

306—17

Each of the defendants introduced evidence to establish an alibi. Garbaciak testified that on the 7th of June he was at home all day helping his parents move from down-stairs to the second flat up-stairs in the same building. His mother testified that he helped them to move from eleven o'clock in the forenoon until eleven o'clock at night. His father and a man named John Gonerka, who had formerly boarded in the family, testified to the same thing. Garbaciak's sister, who was working at A. Stein & Co.'s and went to work at 7:45 in the morning, testified that on reaching home at five o'clock in the evening she found Joe at work there helping his mother take the furniture up-stairs. Peich testified that in the afternoon of June 7, about two o'clock, he went to a grocery store and soft drink parlor kept at 4922 South Racine avenue by Theodore Masterson and helped Masterson repair his automobile. He was there about three o'clock, and could not tell exactly how long he stayed and helped Masterson fix the car, and Masterson testified that Peich came between 1:30 and 2:00 o'clock and was engaged in working on the automobile until between 5:00 and 5:30 o'clock.

The clear and positive identification of the defendants by the victims of the crime, and the conversation at the police station testified to by Nathanson and the officers, is contradicted by the defendants, and the evidence in regard to their alibi is inconsistent with their guilt. In this condition of the evidence it was the province of the jury to determine what testimony should be believed, and we see no reason for believing that the jury did not arrive at the correct conclusion.

The plaintiffs in error complain that the trial judge asked many leading and suggestive questions of the various witnesses and by so doing gave the jury the impression that he leaned toward the prosecution and the plaintiffs in error were prejudiced by his attitude. An examination of the record does not bear out this complaint. The judge at

various times during the trial asked some questions, but none of them of a character to prejudice the defendants. They simply had a tendency to expedite the trial and help in the orderly introduction of the evidence.    There was nothing in any question asked, or, so far as can be judged from the abstract, in any action of the judge, to indicate a feeling in favor of or against either side.

It is contended that the court erred in refusing to give the jury this instruction:

"The jury are instructed that if upon a fair and impartial consideration of all the evidence in the case the jury find that there are two reasonable theories supported by the testimony in the case, and that one of such theories is consistent with the theory that the defendants are guilty as charged in the indictment and the other is consistent with the innocence of the defendants, then it is the policy of the law and the law makes it the duty of the jury to adopt that theory which is consistent with the innocence of the defendants and to find the defendants not guilty."

It is true, as was said in *People* v. *Ahrling,* 279 Ill. 70, that where an act may be attributed to a criminal or to an innocent cause it will be attributed to the innocent cause rather than to the criminal one, and that a crime is never presumed where the conditions may be explained upon an innocent hypothesis.    This principle has no application to this case.    There are no two hypotheses,—one based upon an innocent cause and another upon a criminal one.    The case depends merely upon the credibility of the evidence and its sufficiency to prove the charge.

Instruction 4, which was refused, is as follows:

"You have a right to take into consideration all the circumstances surrounding this alleged hold-up, and it is for you to decide whether or not a person put in such imminent peril, and taken by surprise, if any, as the complaining witness in this case has testified to, is or is not liable to be mistaken in his identification, and whether or not he has

made a mistake in identifying the defendants, or either of them, in this case."

This instruction states no proposition of law. It is merely an argument on the evidence and was properly refused.

Complaint is made of the refusal of instructions Nos. 14 and 15, but so far as they are material they are both included in instruction No. 9, which was given. So refused instruction No. 8 is included in given instruction No. 6.

The judgment will be affirmed.    *Judgment affirmed.*